OPINION
Defendant-appellant Anthony L. Williams appeals the judgment entered in the Mahoning County Common Pleas Court on a jury verdict which found him guilty of aggravated murder with an attendant firearm specification. For the following reasons, appellant's convictions are affirmed.
 I. FACTS
During the evening hours of September 21, 1997 and the early morning hours of September 22, 1997, appellant gathered together a group of individuals amongst which were Tracy Fears, Brian Thomas and Semmie Shorter. It is disputed as to whether Gerald Hardaway was also a member of the group. The group was formed in order to exact revenge upon Chris Chapman who was believed to have killed appellant's cousin on September 16, 1997. In that Chapman was known to frequent his girlfriend's residence, the group had showered her house with bullets the prior evening. However, since neither Chapman nor his girlfriend were injured or killed in that attack, the group devised a more thorough plan in order to avenge the death of appellant's cousin.
It was decided that the group would firebomb the residence where Chapman and his girlfriend were staying in an attempt to force the individuals from the house. Once the two fled the burning structure, the group would then shoot them. In preparation of this plan, the group obtained ski masks from Wal-Mart. Additionally, firebombs were prepared and guns were gathered. The group entered appellant's van and set off to put their plan into effect. At some point in time during the course of the above described events, Antwon Stroughn joined the group.
When the group arrived in the vicinity of the targeted house, appellant parked the van and the group exited the vehicle with their guns and firebombs. While walking to the site where the plan was to be carried out, Stroughn advised the group that he no longer wished to be involved in the plan. Upon making this decision to abandon the plan, Stroughn was advised that he would be killed if he refused to assist in the firebombing and shooting. Subsequently, both appellant and Shorter shot Stroughn a number of times which resulted in his death. There is some testimony on record which suggests that while the group did not complete their plan, they did nonetheless fire shots at the targeted residence prior to fleeing the area. Stroughn was found dead the next day with a total of four bullet wounds.
Appellant would eventually be arrested in regards to Stroughn's shooting and was indicted on one charge of aggravated murder in violation of R.C. 2903.01(A). Pursuant to R.C. 2941.145(A), the murder charge was accompanied by a firearm specification. Following the completion of all pre-trial matters, a jury trial commenced on February 25, 1998. Upon completion of the state's case-in-chief, appellant chose not to present any evidence. Subsequently, the trial court provided the jury with various jury instructions amongst which was an instruction on transferred intent. On March 3, 1998, the jury returned from deliberations with a guilty verdict as to both the aggravated murder charge and the attendant firearm specification. The trial court sentenced appellant to a life sentence with eligibility for parole after serving twenty years as related to the aggravated murder conviction. Additionally, appellant was sentenced to a three year term of incarceration for the firearm specification which was ordered to be served prior and consecutively to the life sentence.
A timely notice of appeal was filed on April 2, 1998. Appellant alleges three assignments of error on appeal, the first of which revolves around the jury instruction regarding intent and the transfer thereof as set forth immediately infra.
In pertinent part, the court instructed as follows:
 "Prior calculation and design means that the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the means or weapon with which to cause the death of another.
 To constitute prior calculation there must have been sufficient time and opportunity for the planning of an act of homicide, and circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death. No definite period of time must elapse and no particular amount of consideration must be given, but acting on the spur of the moment or after momentary consideration of the purpose to cause the death is not sufficient.
 If you find that the defendant actually formed a purpose to cause the death of another and that this purpose was arrived at with calculation and design before he performed the act, that is sufficient for this element of the offense of aggravated murder." (Tr. 999-1000).
 "* * * If you find that the defendant and others did have purpose to cause the death of a particular person and that the shot or shots fired actually caused the death of another person, then the defendant would be just as guilty of purposely causing the death of the actual victim as if the shot or shots had taken effect upon the person originally intended.
 The purpose required for aggravated murder is to cause the death of another, not any specific person. If the shot failed to strike the person originally intended but caused the death of another, the element of purpose remains and the offense is as complete as though the person for whom the shot was originally intended died." (Tr. 1003-1004)
 "* * * If you find that sometime during the evening that the defendant developed with prior calculation and design the specific intention to kill another human being and that this intention remained during the time that Antwon Stroughn was killed, then the defendant may be found guilty of aggravated murder as he is charged in the indictment or of complicity to commit aggravated murder. The fact that this particular victim was not the person originally sought by the group does not diminish, nor does it negate the criminal responsibility of the defendant. In other words, if you find that this defendant had developed the specific intention to kill another human being with prior calculation and design and that such intent remained while he committed the homicide of Antwon Stroughn or that he aided and abetted another in committing the aggravated murder of Antwon Stroughn, even though the person actually shot and killed was not the original intended victim, then you may find the defendant guilty of aggravated murder or of complicity to commit aggravated murder." (Tr. 1008-1009)
 "* * * As with prior calculation and design, the culpability for a scheme designed to implement the calculated decision to kill another is not altered by the fact that the scheme is directed at someone other than the actual victim. Therefore, if one purposely causes the death of another and the death is the result of the scheme designed to implement the calculated decision to kill someone other than the victim, the offender may be found guilty of aggravated murder.
 The purpose and prior calculation and design with which shots are fired is not changed in any degree by the circumstances that it did not take effect upon the person at whom it was originally directed. The purpose and prior calculation and design remains. And if the person that is shot is killed, the crime is as complete as though the person against whom the shots were originally intended had been killed, the lives of all persons being equally sacred in the eyes of the law and equally protected by its provisions." (Tr. 1011-1012)
 II. ASSIGNMENT OF ERROR NUMBER ONE
Appellant's first assignment of error reads as follows:
 "MR. WILLIAMS' RIGHT TO DUE PROCESS UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION WAS VIOLATED WHEN THE COURT INSTRUCTED THE JURY AS TO THE USE OF TRANSFERRED INTENT DOCTRINE IN A MANNER INCONSISTENT WITH OHIO LAW RESULTING IN A LESSENING OF THE STATE'S BURDEN OF PROOF."
Under appellant's first assignment of error, it is argued that the trial court improperly instructed the jury as to transferred intent. It is appellant's belief that in order for a transferred intent instruction to be appropriate, the offense against the actual victim must be related both temporally and spatially to the offense which was anticipated against the intended victim. In the case at bar, appellant asserts that the killing of Antwon Stroughn was too remote both as to time and space so as to transfer the intent as related to the killing of Chapman and his girlfriend. By improperly instructing the jury as to transferred intent, it is argued that the trial court essentially relieved the state of its burden to prove beyond a reasonable doubt the existence of all of the elements of the aggravated murder offense.
 A. APPLICABLE LAW
The doctrine of transferred intent is a long-standing feature of Ohio's criminal law. See Wareham v. State (1874), 25 Ohio St. 601. The most common uses of the doctrine in an aggravated murder setting are in instances where an unintended or mistakenly identified individual is killed. For instance, if the defendant makes a calculated decision to kill a particular person, then the defendant is guilty of aggravated murder if any bystander is accidentally killed during the defendant's attempt to kill his intended victim. See State v. Richey (1992), 64 Ohio St.3d 353,364 (holding that where the intended victims escape from an act of arson but a baby dies in the fire, the defendant's intent regarding the individuals that escaped transfers to the baby). This type of case is also often characterized by stray bullets which result in the death of a bystander rather than the intended victim. Similarly, if a defendant kills someone whom he thinks is his intended victim and later finds out that he misidentified his victim, then the defendant is just as guilty as if he killed his intended victim.
However, the scope of the transferred intent doctrine has been expanded beyond these two situations by the Ohio Supreme Court through its decisions in State v. Solomon (1981), 66 Ohio St.2d 214
and State v. Sowell (1988), 39 Ohio St.3d 322. In these decisions, the court determined that the doctrine would be applicable to those situations in which a defendant makes a calculated decision to kill someone and while engaging in his scheme to kill his intended victim, he purposely, but maybe not with actual prior calculation and design, kills someone else. Cf.People v. Plummer (1998), 229 Mich. App. 293, 305;581 N.W.2d 753, 759 (holding that where the defendant makes a calculated decision to kill one person and a second person interrupts, the doctrine of transferred intent does not apply when the defendant intentionally aims at and shoots the second person). Ohio courts do not follow the law or reasoning of the Michigan court inPlummer.
In the case of Solomon, supra, the defendant entered an apartment after making a calculated decision to kill a certain man. When the man's wife tried to stop the defendant, the defendant intentionally shot the wife in the throat. Apparently, due to the short amount of time that occurred between the defendant entering the apartment and his shooting of the wife, the state desired to prove prior calculation and design in the wife's murder by utilizing the defendant's intent to kill the husband. Thus, the doctrine of transferred intent was used at trial to convict the defendant of aggravated murder.
The Supreme Court agreed that the doctrine of transferred intent was applicable in such a scenario, holding:
 "[T]he culpability of a scheme designed to implement the calculated decision to kill is not altered by the fact that the scheme is directed at someone other than the actual victim. Therefore, we hold that if one purposely causes the death of another and the death is the result of a scheme designed to implement the calculated decision to kill someone other than the victim, the offender is guilty of aggravated murder in violation of R.C. 2903.01(A)." Id. at 218.
An extension of this holding occurred in Sowell, supra. In this case, the defendant made a calculated decision to kill a certain woman who was staying with his neighbor. After appellant arrived at the neighbor's apartment with a gun and voiced his intentions, the neighbor attempted to talk appellant out of causing any harm. The neighbor's persuasion initially appeared to be working. As the neighbor was walking appellant out of the apartment, appellant turned around and shot the neighbor in the abdomen and then in the head. The Ohio Supreme Court stated that the neighbor's death was the result of the scheme designed to implement the defendant's calculated decision to kill the woman.Id. at 331. Hence, the court held that the defendant acted with prior calculation and design under the doctrine of transferred intent. Id. See, also, United States v. Concepcion (C.A.2, 1992),983 F.2d 369, 382 (upholding the use of the doctrine of transferred intent where the defendant intentionally shot a victim who was not the originally intended victim but who threatened to stop him as he was about to carry out a scheme against the originally intended victim); State v. Prichard (Feb. 7, 1996), Hamilton App. No. C-941011, unreported at 5 (stating, in a case where the victim's death was not accidental, that where the requisite intent exists to kill any person at the time of the homicide, then this intent could be transferred to the victim).
In reviewing the authority cited by the court in reaching its decision in Sowell, this court is provided valuable insight in regards to appellant's temporal and spatial arguments. Particularly, the case of Murry v. State (Wyo. 1986),713 P.2d 202 is helpful in determining what, if any role, the temporal and spatial elements are to have in applying the transferred intent doctrine.
In Murry, the defendant was frequenting a liquor establishment with his wife when he became involved in an altercation. After spending several hours in the bar, defendant exchanged words with a fellow bar patron. As a result, the patron struck the defendant in the nose, knocking him to the floor. Infuriated by these actions, defendant immediately left the establishment and went to his vehicle in the parking lot in order to obtain a shotgun. Defendant then stuck his head inside the bar door and requested that the patron come outside. Realizing that her husband was likely to cause serious physical harm to the bar patron should he go outside, defendant's wife persuaded two other individuals to go outside in an attempt to calm her husband. Within two to three minutes, one of the individuals who had been sent outside lay dead from a shot fired by the defendant. Based upon these facts, it was the Wyoming Supreme Court's ultimate decision that the trial court properly utilized the transferred intent doctrine to find the defendant guilty of first degree murder. Id. at 205. The court reasoned that since the defendant had clearly intended to kill the bar patron, said intent could be transferred to the individual who was ultimately killed in the parking lot. Id.
 B. ANALYSIS
Based upon the state of the law as it currently exists in Ohio, this court is compelled to hold that the trial court correctly instructed the jury as to transferred intent. As the Ohio Supreme Court clearly and unambiguously stated in both Solomon andSowell, the test simply is whether a defendant "purposely causes the death of another and the death is the result of a scheme
designed to implement the calculated decision to kill someone other than the victim." (Emphasis added). Solomon at 218; Sowell
at 330. In neither of its decisions does the Ohio Supreme Court take the opportunity to provide limiting factors beyond this test as related to the applicability of the transferred intent doctrine.
In applying this test to the facts at bar, it is clear that the trial court made the correct decision to instruct the jury on transferred intent. Testimony at trial clearly revealed that appellant had developed a scheme, the purpose of which was to kill Chris Chapman. In addition to developing the scheme, appellant took a number of material steps in order to effectuate the plan. First, appellant put together a group of people in order to properly put the scheme into effect. Additionally, appellant gathered all of the necessary materials for his plan. He obtained ski masks and guns and prepared the firebombs needed to flush Chris Chapman from his girlfriend's house. These materials were loaded into appellant's van and the group set off to the targeted house. At some point during these preparations, Antwon Stroughn joined the group.
Ultimately, appellant reached an area near the targeted house where he chose to leave the van and have the group walk to the residence. It was as the individuals neared their final destination that Stroughn had a change of heart and attempted to abandon the plan. Appellant first warned Stroughn that he would be killed if he refused to proceed as planned. When Stroughn continued to refuse to cooperate, he was gunned down.
In light of these circumstances, it is clear that appellant had developed a scheme and had taken substantial steps towards the completion of the plan. In actuality, all that remained was for appellant and his group to put their thoughts into action. They were in the vicinity of the targeted residence and but for Stroughn's dissension the scheme would likely have been completed. Furthermore, appellant's actions were clearly purposeful and the death was the result of the original scheme. There is no indication that appellant's death was accidental in nature. On the contrary, testimony on record indicates that appellant informed Stroughn that he would be shot if he did not continue on with the group. These facts further support the conclusion that the death was the result of the scheme itself as it occurred during the course of the scheme and was caused due to one party's refusal to assist in completing the plan. Consequently, the facts in the case sub judice support an application of the transferred intent doctrine as it exists subsequent to Solomon and Sowell, supra.
Clearly the Ohio Supreme Court has not explicitly adopted the temporal and spatial elements which appellant requests this court to consider. This determination is supported by the court's reliance upon the Murry decision in which the intended victim was not physically near the actual victim. However, even if we were to read those elements into the transferred intent doctrine as set forth in Solomon and Sowell, we would essentially reach the same conclusion under the present scenario. As previously discussed, appellant and his group of individuals had already completed all of the necessary planning tasks in' order to carry out their scheme. Additionally, they had driven to the general vicinity and were walking towards the house with guns and firebombs in hand. All that remained was for the plan to be carried out. Under these circumstances, Stroughn's death would not be too remote as to either time or space so as to prohibit the use of the transferred intent doctrine to prove prior calculation and design.
This court would note however that while we cannot embrace appellant's argument based upon the current state of the law in Ohio, appellant did nonetheless present a compelling argument which caused this court to agonize over the issue presented. Although the transferred intent doctrine as set forth in Solomon
and Sowell does not provide for temporal and spatial limitations, we would invite the Ohio Supreme Court to revisit this issue as the test as it currently exists could be somewhat problematic.
Due to the language used by the court, any death which is purposely caused during the course of the scheme may fall within the transferred intent doctrine. For example, testimony in the present case indicates that appellant went to Wal-Mart for the purpose of acquiring ski masks for use during the murder of Chris Chapman. If while in the Wal-Mart parking lot, appellant's car was hit by another vehicle and appellant flew into a fit of rage and shot the other driver, technically such actions would give rise to the application of the transferred intent doctrine. As such, the prosecutor could rely upon the prior calculation and design as it existed for the Chapman murder in order to convict appellant of the aggravated murder of the other driver. Under situations such as these, perhaps the transferred intent doctrine should not be applied due to the remoteness as well as the weak nexus to the effectuation of the original scheme. On the other hand, however, perhaps the court intended to encompass all deaths under this version of the transferred intent doctrine regardless of their remoteness as to both time and space so long as they resulted from the original scheme. Nevertheless, until the Ohio Supreme Court chooses to alter or clarify the language it previously used, this court will be compelled to apply the doctrine as it currently exists.
Based upon the foregoing analysis, it cannot be held that the trial court erred in instructing the jury regarding transferred intent. Thus, the state was not relieved of its duty to prove all elements of the charged offenses. Appellant's first assignment of error is held to lack merit.
 III. ASSIGNMENT OF ERROR NUMBER TWO
Appellant's second assignment of error reads:
 "THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF THE OHIO CONSTITUTION ART. IV § 3(b)(3) RESULTING IN MR. WILLIAMS' IMPROPER CONVICTION."
Appellant next argues that his conviction was against the manifest weight of the evidence due to the nature of the testimony relied upon to reach a conviction. Particularly, appellant challenges the testimony provided by Semmie Shorter and Tracy Fears.
As to Semmie Shorter's testimony, appellant is critical of such in that it is viewed as self-serving in nature. Since Shorter received a favorable plea arrangement in return for his testimony, appellant argues that the testimony is less reliable. Additionally, appellant asserts that Shorter had his own motives for killing Antwon Stroughn which again is viewed as making the testimony unreliable. According to the record, Shorter and Stroughn were members of rival gangs and had previously been involved in altercations. As such, it is believed that Shorter actually could have been responsible for the killing and was testifying against appellant solely to cover his own tracks. Finally, appellant asserts that Shorter's testimony was inconsistent with a previous statement given to police and, thus, should be discounted.
As to Tracy Fears testimony, appellant again takes issue with the fact that the witness received a favorable plea agreement in exchange for her testimony at appellant's trial. The existence of this agreement is argued to reduce the reliability of Fears' testimony as it was self-serving. Furthermore, appellant contends that the testimony was unreliable due to the fact that Fears admitted to consuming alcohol and Valium on the morning of the murder. The effects of these substances would cloud Fears' perception of the events which transpired thereby decreasing the reliability of her later testimony. Finally, appellant points to a number of inconsistencies between the testimony provided by Shorter and Fears in support of his proposition that the aggravated murder conviction was against the manifest weight of the evidence.
 A. APPLICABLE LAW
As this court has indicated on numerous occasions in the past, weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." State v. Clemons
(1998), 82 Ohio St.3d 438, 444 quoting State v. Thompkins
(1997), 78 Ohio St.3d 380, 387. Reviewing courts will not reverse a decision on manifest weight grounds unless after evaluating the record, weighing the evidence and the inferences that can be reasonably drawn therefrom, and considering the witnesses' credibility, the court determines that the trial court "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."Thompkins, supra quoting State v. Martin (1983), 20 Ohio App.3d 172,175. Only in exceptional cases where the evidence weighs heavily against the conviction should the court grant a new trial on manifest weight grounds. Id. In contrast to a sufficiency review, an appellate court in deciding whether a conviction is against the manifest weight of the evidence is not required to view the evidence in a light most favorable to the prosecution but rather should determine whether the prosecution has carried its burden of persuasion. Id.
Moreover, an appellate court must keep in mind that despite the above noted standard, the determination regarding witness credibility is primarily for the trier of fact. State v. Hill
(1996), 75 Ohio St.3d 195, 205 citing State v. DeHass (1967),10 Ohio St.2d 230, 231. The rationale behind this precedent is that the trier of fact occupies the optimal viewpoint for observing and assessing the demeanor of the witnesses as they testify.Myers v. Garson (1993), 66 Ohio St.3d 610, 615; Seasons Coal Co.v. Cleveland (1984), 10 Ohio St.3d 77, 80.
 B. ANALYSIS
Appellant's conviction for aggravated murder was obtained pursuant to R.C. 2903.01(A) which sets forth the following elements:
 "(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."
A review of the record substantiates the jury's finding that the state had presented adequate evidence so as to warrant a finding of guilt on the aggravated murder charge. First, there was ample evidence to support a finding that appellant purposely killed Antwon Stroughn. According to Semmie Shorter's testimony, appellant advised Stroughn that he would have to die if he refused to assist the group with their scheme. Shortly thereafter, appellant shot Stroughn from close range. There was no indication in any of the witnesses' testimony that said shooting was accidental in nature. The testimony provided by Tracy Fears corroborated the fact that appellant was responsible for shooting Stroughn. On two separate occasions during her testimony, Fears identified appellant as the one responsible for Stroughn's death.
As to the issue of prior calculation and design, as explained under appellant's first assignment of error, said element was met due to the fact that appellant had devised a scheme to kill Chris Chapman. Since Stroughn's death occurred as a result of this scheme, the intent originally developed by appellant in regards to Chapman could properly be transferred to the crime against Stroughn. Based upon these circumstances, it cannot be held that the jury clearly lost its way or that the evidence weighed heavily against the conviction. This conclusion is further supported by the fact that appellant did not provide any contradictory testimony or evidence on his own behalf. While such certainly is not required, the lack thereof serves only to strengthen the state's case as related to any manifest weight of the evidence attack.
Although appellant argues that the testimony of Semmie Shorter was not credible because he had a motivation to lie, his initial statement to police was untruthful, and he received a favorable plea agreement, all of said factors which could diminish Semmie Shorter's credibility were made known to the jury. Additionally, the trial court thoroughly instructed the jury as to the credibility of witnesses. Moreover, the court gave the proper instruction about accomplice testimony stating that it is to be evaluated with great caution and grave suspicion. Thus, the jury was reminded of any motivations that existed to testify untruthfully. (See R.C. 2923.03(D) requiring such an instruction) It was primarily for the jury to assess the worth and quality of Semmie Shorter's testimony.
Appellant also states that the testimony of Tracy Fears was unreliable because she drank the day of the murder, ingested four Valium and smoked marijuana. First of all, Tracy Fears stated that she only drank on the morning of the murder and did not drink the rest of the day. It appears that the Valium were ingested in the morning as well. Nevertheless, all of these acts were exposed to the jury and, as such, they were permitted to consider Fears' condition when evaluating the credibility of her testimony. Since Tracy Fears' story corroborated the main parts of Semmie Shorter's story, it was not unreasonable for the jury to find that she testified truthfully and that she correctly recalled the events to which she testified.
As to appellant's argument regarding inconsistencies between the testimony provided by Semmie Shorter and Tracy Fears, admittedly some inconsistencies do exist. However, there also exists many consistencies in these witnesses' versions of the events. Furthermore, defense counsel cross-examined on the inconsistencies, thus pointing them out' to the jury. The mere fact that inconsistencies exist as related to witness testimony does not in and of itself provide this court with sufficient grounds to order a new trial on the basis that the verdict was against the manifest weight of the evidence. If such were the case, few criminal convictions would survive on appellate review. Appellant has' not persuaded this court that it has been presented with one of those exceptional cases whereby the evidence weighs heavily against the conviction.
Clearly the jury occupied a better position than this court from which it could observe the gestures, voice inflections and demeanor of each witness as the testimony was presented. SeasonsCoal Co., Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 80. After reading the transcripts of testimony and reviewing the evidence, we refuse to sit as the "thirteenth juror" who claims that the jury clearly lost its way and created a manifest miscarriage of justice when it chose to believe the testimony of Semmie Shorter and Tracy Fears that appellant shot Antwon Stroughn in the course of the scheme designed to kill others. Accordingly, this assignment of error is overruled.
 IV. ASSIGNMENT OF ERROR NUMBER THREE
Appellant's third assignment of error reads:
 "THE TRIAL COURT ERRED BY ADMITTING GRAPHIC PHOTOGRAPHS OF THE MURDER VICTIM WHICH WERE IRRELEVANT, CUMULATIVE AND WHOSE PREJUDICIAL VALUE SUBSTANTIALLY OUTWEIGHED THEIR PROBATIVE VALUE RESULTING IN PREJUDICE TO MR. WILLIAMS THAT VIOLATES HIS RIGHT TO A FAIR TRIAL UNDER THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION."
In appellant's final assignment of error, it is argued that the trial court erred when it admitted various photographs which are believed to be both overly prejudicial and cumulative. Specifically, appellant references three autopsy photographs of the victim and three photographs of x-rays depicting the location of bullets lodged in appellant's body. It is appellant's position that not only were the photographs gruesome and inflammatory but also their admission was not necessary as another less inflammatory method of introducing evidence was offered. Appellant asserts that a diagram which was presented at trial served the same purpose of the photographs without interjecting the prejudicial effect presented by the graphic nature of the photographs. Due to the combination of these factors, appellant contends that the trial court abused its discretion in admitting the photographs thereby denying his right to a fair trial.
 A. APPLICABLE LAW
Pursuant to Evid.R. 403(A), relevant evidence must be excluded if the possibility of unfair prejudice substantially outweighs the probative value of the evidence. Similarly, Evid.R. 403(B) provides that relevant evidence may be excluded when the possible prejudice caused by the needless presentation of cumulative evidence substantially outweighs the probative value of the evidence. The application of these rules during the evaluation of photographs is left to the sound discretion of the trial court. State v. Lundgren (1995), 73 Ohio St.3d 474, 485; Statev. Maurer (1984), 15 Ohio St.3d 239, 264.
The mere fact that a photograph is gruesome does not render it inadmissible. Maurer at 265, citing State v. Woodards (1966),6 Ohio St.2d 14, 25. Gruesome photographs are admissible if they assist the fact-finder in determining the issues or are illustrative of witness testimony and forensic evidence without causing material prejudice. Maurer at 266. For instance, photographs showing the number and location of bullet wounds may be corroborative of testimony and probative to the issue of whether a killing was done with purpose. Maurer at 265. As to the issue of repetitiveness, this court has held that in situations where the photographs are not particularly gruesome, "it is difficult to imagine how the sheer number of photographs admitted can result in prejudice requiring reversal." State v. Gerish
(April 22, 1999), Mahoning App. No. 92-CA-85, unreported quotingState v. Allen (1995), 73 Ohio St.3d 626, 636; State v. DePew
(1988), 38 Ohio St.3d 275, 281.
 B. ANALYSIS
First, we will briefly address appellant's complaints regarding Exhibits 29, 30 and 32. These exhibits are merely photographs of x-rays that reveal the bullets and fragments lodged in the victim's head and thigh. The exhibits are probative in that they show entrance wounds and the bullets' places of rest. There was testimony about recovered slugs, and the x-rays show from where exactly the coroner recovered the slugs. Additionally, these x-rays are not gruesome, shocking or prejudicial.
As to the color photographs depicting the victims' four bullet wounds, appellant contests the admission of Exhibit 27, which is a photograph of the bullet wound to the hip area, and Exhibit 28, which is a photograph of the bullet wound to the thigh. Each shows a bullet hole of two to three centimeters in diameter with red tissue exposed in the opening. Since these photographs are much less graphic than Exhibit 26 showing the chest wound, we shall focus our analysis on the photograph of the chest wound.
Exhibit 26 shows a small bullet wound to the face and a large grazing wound to the victim's chest. The chest wound is gaping, displays red tissue and appears to measure approximately six inches long by two inches wide. Despite the graphic nature of the wounds, the area depicted has been cleaned and there are no traces of blood outside the wound. While this photograph mayarguably be gruesome in nature, it portrays the chest wound allegedly inflicted upon the victim by appellant. It corroborates the coroner's testimony that the bullet grazed the victim in a downward trajectory which corroborates other testimony that appellant shot the victim a second time as the victim was falling from the first shot that he had fired. As for all three photographs, "[t]he probative value of these photographs is evident, as an illustration of where a bullet enters the body and evidence of the resulting wound are probative of a purposeful killing." State v. Goodwin (1999), 84 Ohio St.3d 331, 342.
Additional grounds for affirming the trial court's decision are gained from the realization that when the state was offering its exhibits for admission, the trial court sustained defense counsel's objections as to a number of photographs on the grounds that some were cumulative and one, showing the victim's face before it was cleaned, was gruesome. The court allowed the three pictures of the victim's body in to show the four bullet wounds. The court made an informed decision to exclude certain photographs and admit others. The trial court determined that the pictures of the four wounds were more probative than prejudicial. Additionally, the court considered that the photographs illustrated the nature and location of the wounds and corroborated the testimony of the coroner. See State v. Twyford
(Sept. 25, 1998), Jefferson App. No. 93-J-13, unreported, 32. Moreover, the photographs admitted are not repetitive or cumulative to each other.
We refuse to hold that merely because a diagram is available, then the state may not use photographs even if their probative value outweighs any danger of prejudicial impact. The state is free to choose amongst available options as to how to present evidence in support of its case. In accordance, we cannot say that the court abused its discretion when it decided that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. As such, this assignment of error is overruled.
For the foregoing reasons, appellant's assignments of error are overruled and the judgment of the trial court is affirmed in its entirety.
COX, P.J., WAITE, concurs.
 _________________________ JOSEPH J. VUKOVICH, JUDGE